UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BOBBIE JANE SMITH,<br><br>       Plaintiff,<br><br>   v.<br><br>NANCY A. BERRYHILL,<br><br>       Defendant. | Case No.18-cv-00887-VKD<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 26, 31 |

Plaintiff Bobbie Jane Smith appeals a final decision by defendant Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381, *et seq.*, and for supplemental security income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for summary judgment. Dkt. Nos. 26, 31. Pursuant to the Court's order (Dkt. No. 19), Ms. Smith also submitted a statement of the administrative record. Dkt. No. 27. The Commissioner did not comply with the Court's order.

Ms. Smith contends that the ALJ erred in multiple respects: (1) the ALJ failed to develop the record concerning her visual impairments; (2) the ALJ erred at step two in not finding her visual impairments to be severe; (3) the ALJ erred at step four by failing to account for Ms. Smith's visual impairments in the RFC; (4) the ALJ erred at step four in discounting or rejecting Dr. Tanenhaus's opinion; (5) the ALJ erred in finding the statements of Ms. Smith and Ms. Cox not entirely credible or consistent with the record; and (6) the ALJ failed to meet her burden at step five in evaluating the testimony of the vocational expert.

The matter was submitted without oral argument. Upon consideration of the moving and

responding papers, the relevant evidence of record, and for the reasons set forth below, Ms. Smith's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order.[1]

## I.    STANDARD FOR DETERMINING DISABILITY

### A.    The Five-Step Analysis

A claimant is considered disabled under the Act if he meets two requirements.[2] First, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment must be so severe that a claimant is unable to do previous work, and cannot "engage in any other kind of substantial gainful work which exists in the national economy," considering the claimant's age, education, and work experience. *Id.* § 423(d)(2)(A).

In determining whether a claimant has a disability within the meaning of the Act, an Administrative Law Judge ("ALJ") follows a five-step sequential analysis:

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two.

At step two, the ALJ assesses the medical severity of the claimant's impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe medically determinable physical or mental impairment, or a combination of impairments, that is expected to last at least 12 continuous months, he is disabled.

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 11, 18.

[2] The standards for determining disability are the same under both the SSI and DIB programs. *Nelson v. Comm'r*, No. C 07-1810 PVT, 2010 WL 4973623, at *1 n.2 (N.D. Cal. Dec. 1, 2010) (citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)).

*Id.* §§ 404.1509, 404.1520(a)(4)(ii), 416.920(a)(4)(ii), (d).  Otherwise, the evaluation proceeds to step three.

At step three, the ALJ determines whether the claimant's impairments or combination of impairments meets or medically equals the requirements of the Commissioner's Listing of Impairments.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If so, a conclusive presumption of disability applies.  If not, the analysis proceeds to step four.

At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to perform his past work despite his limitations.  *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant can still perform past work, then he is not disabled.  If the claimant cannot perform his past work, then the evaluation proceeds to step five.

At the fifth and final step, the ALJ must determine whether the claimant can make an adjustment to other work, considering the claimant's RFC, age, education, and work experience.  *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If so, the claimant is not disabled.

The claimant bears the burden of proof at steps one through four.  The Commissioner has the burden at step five.  *Bustamante v. Massanari*, 262 F.3d 949, 953–54 (9th Cir. 2001).

**B.      Supplemental Regulations for Determining Mental Disability**

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration ("SSA") has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment, establishing a "special technique at each level in the administrative review process."  20 C.F.R. §§ 416.920a(a), 1520a(a) (2016).  First, the ALJ evaluates the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment."  *Id.* §§ 416.920a(b)(1), 1520a(b)(1) (2016).   For each of the categories contained in the adult mental disorder listing, these specific symptoms, signs, and laboratory findings are described in "paragraph A."  20 C.F.R. pt. 404, Subpt. P., App. 1, § 12.00 (2016).

If the claimant has a "medically determinable mental impairment," the ALJ assesses the degree of the claimant's functional limitation in the four "broad functional areas" identified in

3

paragraph B and paragraph C of the adult mental disorders listings.  *See* 20 C.F.R. §§ 416.920a(c)(3), 1520a(c)(3) (2016); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July 2, 1996).[3]  At the time of the ALJ's decision, those four functional areas were: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §§ 416.920a(c)(3), 1520a(c)(3) (2016).  Limitations are rated on a "five-point scale: None, mild, moderate, marked, and extreme."  *Id.* §§ 416.920a(c)(4), 1520a(c)(4) (2016).  When discussing the fourth functional area (episodes of decompensation), the limitation is rated on a "four-point scale: None, one or two, three, four or more."  *Id.* §§ 416.920a(c)(4), 1520a(c)(4) (2016).  Based on these limitations, the ALJ determines whether the claimant has a severe mental impairment and whether it meets or equals a listed impairment.  *See id.* §§ 416.920(d)(1)-(2), 1520a(d)(1)-(3) (2016).  This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above.  SSR 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").

If the ALJ determines that the claimant has a severe mental impairment that neither meets nor equals any listing, the ALJ must assess the claimant's residual functional capacity.  20 C.F.R. §§ 416.920(d)(3), 1520a(d)(3) (2016).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . ."  SSR 96-8p, 1996 WL 374184, at *4.

## II.    BACKGROUND

Ms. Smith was born in 1974 and was 42 years old at the time of the ALJ's decision.   AR 365.  She graduated from high school and took some college courses.  *Id.*  She lives with her

---

[3] "SSRs do not have the force of law.  However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs if they are inconsistent with the statute or regulations."  *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

husband. *Id.* She previously worked in childcare out of her home until the alleged onset of her disability. AR 49. Ms. Smith applied for DIB on March 25, 2013 and SSI on April 23, 2013 based on her back problems, vison problems, mitral valve prolapse, migraine headaches, Marfan syndrome, and depression, alleging an onset of disability on January 1, 2013. AR 18, 150, 168.

### A. Summary of Relevant Medical Evidence

The record includes medical evidence from Ms. Smith's treating physicians, examining physicians, nonexamining physicians, and other medical care providers, as well as testimony and statements from Ms. Smith and her sister. The medical evidence spans the period of time from August 4, 2010 to July 8, 2016.[4]

### 1. Treating ophthalmologist Douglas H. Lanning, O.D.

Douglas H. Lanning, O.D. saw Ms. Smith on January 2, 2013, after she noticed a loss of vision upon waking the day before. AR 382. He diagnosed her with a retinal detachment in her right eye. *Id.* He noted that her prescription in 2010 listed vision correction of -8.50 -6.75 x 023 (20/40) in her right eye and -10.50 -4.50 x 153 (20/40) in her left eye. *Id.* He noted that Ms. Smith's best corrected acuity historically has been 20/40. *Id.* Dr. Lanning referred her to Dr. Denise Kayser for surgery to correct the retinal detachment. AR 377; *see also* AR 382.

### 2. Treating ophthalmologist Denise Kayser, M.D.

#### a. January 3, 2013 visit and letter

On January 3, 2013, Denise Kayser, M.D. examined Ms. Smith and memorialized her findings in treatment notes and in a letter to Dr. Lanning. AR 379, 377–78. Dr. Kayser noted that Ms. Smith's visual acuity with correction was 20/70 in her right eye and 20/50 in her left eye. AR 377, 379. Dr. Kayser observed no increase in acuity in her right eye with pinholing, but did observe an increase in acuity to 20/40 in her left eye with pinholing. *Id.* Dr. Kayser also noted that Ms. Smith's right eye visual fields "demonstrated inferior and temporal visual field defect,"

---

[4] With respect to Ms. Smith's DIB claim, "[a] claimant can qualify for [DIB] only if her disability begins by her date last insured . . . ." *Wellington v. Berryhill*, 878 F.3d 867, 872 (9th Cir. 2017). Ms. Smith's date last insured was September 30, 2013—10 months after her alleged onset date of January 1, 2013. AR 19. The bulk of Ms. Smith's medical records post-date her date last insured. Neither the ALJ nor the parties addressed what relevance, if any, those records have as to her DIB claim.

but that her left visual field was full. *Id.* She further observed that Ms. Smith's right eye demonstrated a macula-on retinal detachment with a large horseshoe-shaped tear. *Id.* Dr. Kayser recommended a pars plana vitrectomy with gas/fluid exchange and laser for Ms. Smith's right eye. AR 378, 379. Dr. Kayser also planned to remove the crystalline lens due to the marked lack of zonular support. *Id.* Dr. Kayser further noted that Ms. Smith exhibited Marfan syndrome with subluxed crystalline lenses and high myopia (nearsightedness) in both eyes. *Id.*

#### b. January 3, 2013 right eye surgery

On January 3, 2013, Dr. Kayser performed a pars plana vitrectomy with pars plana lensectomy, gas fluid exchange and laser in Ms. Smith's right eye. AR 365–66. Dr. Kayser again diagnosed Ms. Smith with a retinal detachment and Marfan syndrome with subluxed crystalline lens in the right eye. AR 365. Ms. Smith tolerated the procedure well without any apparent complications. AR 366.

#### c. January 4, January 8, January 9, January 23, and February 23, 2013 visits

Dr. Kayser saw Ms. Smith for follow-up visits on January 4, January 8, January 9, January 23, and February 2013. AR 370–76. During each of these visits, Dr. Kayser noted that Ms. Smith's retina remained attached, with good intraocular pressure. *Id.* Ms. Smith continually reported gradual improvement in her right eye visual acuity, although she continued to need glasses to correct her vision. *Id.*

### 3. Treating ophthalmologist Andrew Cochrane, M.D.

Andrew Cochrane, M.D. provided Ms. Smith with ophthalmological care from 2013 to 2016.

#### a. January 16, 2013 visit

Ms. Smith saw Dr. Cochrane for the first time on January 16, 2013. AR 447. She reported no eye pain in her right eye following the surgery by Dr. Kayser to repair her retinal detachment. *Id.* At this visit, her intraocular pressure was 40. *Id.* Dr. Cochrane scheduled her for a follow-up appointment in two days to review her intraocular pressure. *Id.*

#### b. January 18, 2013 visit

At a visit with Dr. Cochrane on January 18, 2013, Ms. Smith complained of a severe headache the day before. AR 446. He prescribed her various medications and noted that the intraocular pressure in her right eye was 18. Dr. Cochrane instructed Ms. Smith to follow up with the retina specialist the following week. *Id.*

### c. March 8, 2013 visit

Dr. Cochrane saw Ms. Smith on March 8, 2013. AR 443. He noted that she needed a refraction test done, as her contact lenses exhibited overrefraction. *Id.* Her left contact lens prescription was for a vision correction of -0.50 +1.00 065. *Id.*

### d. March 27, 2013 visit

Dr. Cochrane saw Ms. Smith again on March 27, 2013. AR 442. He noted that her right eye appeared to be improving. *Id.* She reported experiencing blurred vision in both eyes with glasses and with contacts. *Id.* He measured her corrected right eye vision to be 20/25, and her right eye intraocular pressure at 14. *Id.*

### e. April 18, June 16, August 16, and November 1, 2013 visits

Dr. Cochrane saw Ms. Smith on April 18, June 16, August 16, and November 1, 2013. AR 438–41. During this period, the intraocular pressure in her right eye consistently measured between 18 and 24. *Id.*

### f. August 3, 2015 visit

Dr. Cochrane saw Ms. Smith on August 3, 2015. AR 547. Ms. Smith reported a loss of vision in her left eye beginning the previous night. *Id.* Dr. Cochrane diagnosed her with a retinal detachment and recommended following up with a retina specialist. *Id.* He measured her left eye visual acuity at 20/400 with pinholing. *Id.*

### g. August 15, August 21, and September 3, 2015 visits

Although documentation regarding the surgery are missing from the record, it appears that Ms. Smith had surgery to repair a detached retina and to remove the lens in her left eye on August 4, 2015. Dr. Cochrane saw Ms. Smith on August 15, August 21, and September 3, 2015 for follow-up visits after her retinal detachment surgery and lensectomy in her left eye on August 4, 2015. AR 535, 548–50. Ms. Smith did not report any ovular or vision related complaints. *Id.*

7

Her left eye intraocular pressure consistently measured between 15 and 18. *Id.*

### h. September 21, 2015 visit

When Dr. Cochrane saw Ms. Smith on September 21, 2015, she complained of experiencing pain in her left eye. AR 536. Ms. Smith's prescription was for vision correction of +7.75 +0.50 155 +2.50 in her right eye and +7.00 +0.50 050 +2.50 in her left eye. *Id.* With correction, her visual acuity was 20/20 in both eyes. *Id.* Her intraocular pressure was 28 in her right eye and 13 in her left eye. *Id.*

### i. October 12, 2015 visit

Dr. Cochrane saw Ms. Smith on October 12, 2015. AR 538. Although the first page of this treatment record is missing, the second page indicates that Dr. Cochrane performed an "ONH and RNFL analysis"[5] on both of Ms. Smith's eyes, although the results are illegible. *Id.*

### j. May 5, 2016 visit

At a visit on May 5, 2016, Dr. Cochrane diagnosed Ms. Smith as having stable aphakic glaucoma in both eyes. AR 650. Ms. Smith complained of pressure headaches "like 'drills going into head,'" and Dr. Cochrane noted that the last time she presented with those symptoms, her intraocular pressure was high. *Id.* At this visit, her intraocular pressure was 30 in her right eye and 19 in her left eye. *Id.* Her corrected visual acuity was 20/40 in her right eye and 20/20 in her left eye. *Id.* Dr. Cochrane scheduled Ms. Smith for a follow-up appointment with Dr. Mastroni in 1-2 weeks for a second opinion regarding treatment or laser surgery for her glaucoma and high intraocular pressure. *Id.*

### 4. Treating ophthalmologist John S. Mastroni, M.D.

John S. Mastroni, M.D. provided Ms. Smith with ophthalmological care from 2013 to 2016, during the same period of time she also saw Dr. Cochrane.

### a. February 4, 2013 visit

Dr. Mastroni saw Ms. Smith on February 4, 2013. AR 445. She complained of mild pain

---

[5] Ms. Smith says—and the Commissioner does not dispute—that these abbreviations stand for "optic nerve head" and "renal nerve fiber layer" testing. Dkt. No. 26 at 11. According to Ms. Smith, this testing concerns assessments of peripheral vision. *Id.*

in her right eye and having difficulty sleeping due to her scoliosis.  *Id.*  He noted that her right eye was improving, although he measured her visual acuity at 20/400 and her intraocular pressure at 21.  Dr. Mastroni scheduled her for a follow-up appointment and she was to see Dr. Kayser on February 13.  *Id.*

### b.  February 25, 2013 visit

Dr. Mastroni saw Ms. Smith on February 25, 2013.  AR 444.  He noted that her right eye was improving.  He measured her distance prescription as vision correction of -14.00 +3.00 055 in her right eye, with visual acuity of 20/25, and dry manifest refraction as +7.00 +1.00 135.  *Id.*

### c.  May 17, 2016 visit

Dr. Mastroni saw Ms. Smith on May 17, 2016.  AR 648.  Her condition was stable since her last visit.  *Id.*  Her corrected visual acuity was 20/40 in her right eye and 20/30 in her left eye. *Id.*  Her intraocular pressure was 34 in her right eye and 22 in her left eye.  *Id.*  Dr. Mastroni noted worsening aphakic glaucoma and referred Ms. Smith to a glaucoma specialist for surgical evaluation in her right eye.  AR 648–49.

### d.  June 2, 2016 visit

Ms. Smith underwent a trabeculectomy procedure to address the interocular pressure in her right eye on May 25, 2016.  AR 652.  Dr. Mastroni saw Ms. Smith on June 2, 2016 following that procedure.  AR 646.  Ms. Smith reported some irritation when blinking her right eye and that her vision was still blurry but improving.  *Id.*  Her corrected right eye visual acuity was 20/200, and 20/70 with pinholing.  The intraocular pressure in her right eye was 4.  *Id.*  Dr. Mastroni scheduled her for a follow-up appointment in five days.  AR 647.

### e.  June 7, June 15, June 17, June 24, June 30, and July 8, 2016 visits

Dr. Mastroni saw Ms. Smith on June 7, June 15, June 17, June 24, June 30, and July 8, 2016 for follow-up after her right eye trabeculectomy.  AR 632–44.  He consistently described her condition as stable.  *Id.*  Ms. Smith's corrected right eye visual acuity showed gradual improvement from 20/40 to 20/20.  *Id.*  The intraocular pressure in her right eye consistently measured between 10 and 16.  *Id.*

### 5. Treating ophthalmologist Gregory Gibb, M.D.

Gregory Gibb, M.D. saw Ms. Smith on June 10, 2016 following her right eye trabeculectomy. AR 642. Ms. Smith reported the sensation of a foreign body in her right eye. *Id.* Her corrected right eye visual acuity was 20/30, and her intraocular pressure was 13. *Id.* Dr. Gibb scheduled her for a follow-up appointment with Dr. Mastroni the following week. AR 643.

### 6. Treating ophthalmologist Christopher Lin, M.D.

Christopher Lin, M.D. examined Ms. Smith on May 24, 2016 for an initial glaucoma evaluation. AR 652. He found that Ms. Smith suffered from open angle glaucoma in both eyes, and that the medication she had been taking was insufficient to control her right eye intraocular pressure. *Id.* Ms. Smith elected to proceed with a trabeculectomy procedure in her right eye, which Dr. Lin performed on May 25, 2016. *Id.* During a postoperative visit the following day, Dr. Lin found that Ms. Smith's "visual acuity was count fingers in the right eye." *Id.* He provided eye drop medications but prescribed no other medications. *Id.*

### 7. Consultative examining physician Rose Lewis, M.D.

Rose Lewis, M.D. examined Ms. Smith on June 20, 2013 and again on July 18, 2013. AR 426–29, 496–99.

#### a. June 20, 2013 exam

At the June 20, 2013 visit, Ms. Smith described her medical history to Dr. Lewis: In early childhood, Ms. Smith was diagnosed with Marfan syndrome with mitral valve prolapse and an enlarged aortic root. AR 426. She had two surgeries for scoliosis in 1988 and 1989, and two more in 1998. *Id.* She had surgery for a detached retina and a lensectomy in her right eye in January 2013, and as a result, she could not read small print but could see far with that eye. *Id.* Ms. Smith reported that her back and hips hurt a great deal: on a scale of 0-10, her pain was usually about a 5. *Id.* She was unable to walk more than two blocks before needing to stop due to the pain. *Id.* She could climb about 10 steps and stand for about 15 minutes. *Id.* Although Ms. Smith's surgeon cleared her to lift up to 10 pounds, she reported that lifting even five pounds would cause her pain in her lower back. *Id.* Ms. Smith stated that she did not take any pain medication because it made her feel sleepy and "very out of sorts." *Id.*

Ms. Smith described her activities of daily living to Dr. Lewis:  She was able to take care of her own personal needs.  *Id.*  She was able to do all household chores including vacuuming, mopping, sweeping, dusting, laundry, and dishes, but she could only do them in very small increments of time otherwise her back and hip would hurt.  *Id.*  During the day, she cared for children, watched television, and did light housekeeping.  *Id.*

Dr. Lewis described Ms. Smith's appearance as "a very tall slender woman who walks stooped over primarily because of her scoliosis."  *Id.*  Dr. Lewis noted that Ms. Smith was able to walk without an assistive device and that she sat comfortably and could get on and off the examination table by herself.  *Id.*; AR 427.  Without lenses, Ms. Smith's vision was 20/50 in her left eye and 20/70 in her right eye.  AR 427.  Her blood pressure was elevated, although her heart appeared normal.  *Id.*  Ms. Smith was unable to do tandem or toe-heel walking because she could not balance herself on her toes or her heels.  *Id.*

Dr. Lewis opined that Ms. Smith could stand and walk up to four hours due to her decreased balance, joint pains, and back pain following fusion surgery for scoliosis, and that she could sit for up to six hours.  *Id.*  She could lift up to 10 pounds occasionally and carry up to 10 pounds frequently in view of her surgeon's lifting restriction, her decreased balance, joint pains, and back pain.  *Id.*  Dr. Lewis stated that Ms. Smith could climb, balance, stoop, kneel, crouch, and crawl occasionally, and that she could reach, handle, finger, and feel frequently.  *Id.*  Dr. Lewis noted that Ms. Smith was limited with working at heights and around heavy machinery due to her Marfan syndrome and accompanying symptoms, including decreased balance, joint pains, and back pain.  *Id.*  Ms. Smith had no limitations working around extreme temperatures, chemicals, dust, fumes, gases, or excessive noise.  *Id.*

### b.    July 18, 2014 exam

Dr. Lewis evaluated Ms. Smith again on July 18, 2014.  AR 496.  Ms. Smith reported that her back pain had increased dramatically since she last saw Dr. Lewis.  *Id.*  On a scale of 0-10, her pain was a 7 or an 8.  Ms. Smith now had to sometimes use a cane, and her body was extremely stiff in the mornings, requiring her to "log roll" out of bed.  *Id.*  If she stood for more than 10 minutes, her ankles hurt, and she could only sit about 15-20 minutes before her back hurt.  *Id.*  Ms.

11

Smith also experienced frequent pain in her left hip. *Id.* Ms. Smith stated she could only climb three steps before having to stop, whereas previously she was able to climb 10 steps. *Id.* She now had to take Tramadol for the pain, whereas previously she did not take any pain medication. *Id.* The pain medication relieved some of her pain but made her very drowsy. *Id.* She used Icy Hot on her back nearly every day. *Id.* Ms. Smith also stated she was unable to read small print with her right eye, and that if she tried to read with only her left eye, she would get a headache. *Id.*

Ms. Smith described her activities of daily living to Dr. Lewis: She was able to take care of her own personal needs after taking her pain medication and taking a hot shower in the morning. *Id.* A relative helped her do most of her chores because vacuuming, mopping, and sweeping hurt her back. She was able to fold and wash laundry, but not carry it. *Id.* During the day, she occasionally watched television, listened to music, and visited with her mother. *Id.*

Dr. Lewis described Ms. Smith's appearance as "a well-developed and well-nourished female who ambulates in a stooped over position without an assistive device." AR 497. Dr. Lewis noted that Ms. Smith walked slowly, sat comfortably, and could get on and off the examination table by herself. *Id.*; AR 498. Without lenses, Ms. Smith's vision was 20/70 in her left eye and 20/50 in her right eye, with and without pinholing. AR 497. Her blood pressure was elevated, although her heart appeared normal. *Id.* Ms. Smith was unable to do tandem or toe-heel walking because she could not balance herself on her toes or her heels. *Id.* Ms. Smith's left lumbosacral junction, left paraspinal muscular area, left hip joint and ankle were tender to the touch. AR 498.

Dr. Lewis opined that Ms. Smith could stand and walk up to two hours due to pain in the lumbar area and left knee, and that she could sit for up to six hours. AR 499. She could lift up to 10 pounds occasionally and carry up to 10 pounds frequently due to her doctor's lifting restriction, her decreased range of back motion, and back pain. *Id.* Dr. Lewis stated that Ms. Smith could climb, balance, stoop, kneel, crouch, and crawl occasionally, and that she could reach, handle, finger, and feel without limitations. *Id.* Dr. Lewis noted that Ms. Smith was limited with working at heights and around heavy machinery due to her decreased balance, pain in the knee and left hip, and the restriction that she lift no more than 10 pounds. *Id.* Ms. Smith had no limitations working

12

around extreme temperatures, chemicals, dust, fumes, gases, or excessive noise. *Id.*

### 8. Consultative examining psychologist Katherine O'Connell, PhD

Katherine O'Connell, PhD is a psychologist. *See* AR 433. She examined Ms. Smith on July 18, 1013. AR 432–33. Ms. Smith denied any depression, but alleged anxiety. She complained of pain and neck spasms from a July 2011 car accident that kept her up at night. AR 432. Ms. Smith appeared to be well groomed and oriented to person, time, and place. *Id.* Despite Ms. Smith's denial of depression, Dr. O'Connell described her as dysthymic and a "poor historian," with fair to poor memory for both recent and past events. *Id.*

Dr. O'Connell concluded that Ms. Smith had anxiety and depression, and that she would benefit from a medication review and counseling. AR 433. She opined that Ms. Smith was slightly impaired in her ability to understand, carry out, and remember simple tasks, and that she might have moderate difficulty with more complex tasks. *Id.* Ms. Smith demonstrated no impairment in her ability to respond appropriately to coworkers, supervisors, and the public, but she was mildly impaired in her ability to communicate effectively and interact respectfully. *Id.* She also demonstrated a moderately impaired capacity to respond appropriately to usual work situations, and that although she understood and attempted to adhere to expectations, her psychological impairments might moderately impact her current ability to respond effectively. *Id.* Finally, Dr. O'Connell opined that Ms. Smith demonstrated a moderately impaired capacity to deal with changes in a routine work setting. *Id.*

### 9. Consultative examining psychiatrist Herbert Tanenhaus, M.D.

Herbert Tanenhaus, M.D. is a psychiatrist. *See* AR 504. He examined Ms. Smith on July 16, 2014. AR 502. He quoted her chief complaint as, "My constant pain makes me less of a person, because I am less active." *Id.* Ms. Smith described her medical history: She was diagnosed with Marfan syndrome, which affected her in various ways. *Id.* She stated that she attempted to work as an in-home caregiver, but suffered a job-related back injury that led to two surgeries with a "fusion," and she suffered chronic pain ever since. *Id.* Pain medications made her feel groggy. *Id.* Ms. Smith also reported a loss of stamina and limited physical activity due to a mitral valve prolapse and dilated aortic root. *Id.* She also suffered a detached retina following a

car accident. *Id.* Prior to that injury, she stated that the only thing she did well was reading, which she could no longer do. *Id.*

With respect to her mental condition, Ms. Smith had never been prescribed any medications to address anxiety or depression, nor had she ever been in counseling. *Id.* She denied having suicidal thoughts. *Id.* She began suffering anxiety in 2011 after her home was burglarized. *Id.* She avoided crowds due to increased anxiety, which caused rapid heart rate and difficulty breathing. *Id.*

With respect to her activities of daily living, Ms. Smith reported to Dr. Tanenhaus that her activities were limited due to chronic pain and lack of stamina. AR 503. She cooked when she was able to and shared the job of loading the dishwasher with her husband. *Id.* Her nieces assisted with cleaning and vacuuming. *Id.* Ms. Smith was able to load the washing machine if someone else brought the dirty clothes to the laundry. *Id.* She reported difficulty with shopping due to her limitations in standing and walking. *Id.* She bathed in hot water several times a day to help control her pain. *Id.*

Dr. Tanenhaus noted that Ms. Smith was cooperative and gave good effort in the evaluation, with no unusual mannerisms. *Id.* He described her as "not unduly anxious," and she successfully completed the cognition tests Dr. Tanenhaus administered. *Id.* Ms. Smith was unable to read from the Beck Inventory of Depression due to her poor vision. *Id.*

Dr. Tanenhaus diagnosed Ms. Smith with depressive disorder, secondary to her general medical conditions. AR 504. He gave her a GAF score of 48 "due to moderate symptoms of depression and serious impairment with health and occupational functioning." *Id.* He noted that although her mood disorder did not limit her activities of daily living, her physical conditions contributed to the severity of her impairments. *Id.* He stated that Ms. Smith was able to relate appropriately with the public, peers, and supervisors. *Id.* Dr. Tanenhaus further opined: "Her ability to maintain an adequate pace throughout the workday and workweek reliably is severely impaired by her physical conditions. Her history indicated that she would need additional work breaks, as well as having difficulty completing a normal workday and workweek reliably." *Id.*

### 10. Non-examining ophthalmologist W. Benton Boone, M.D.

After the hearing, the ALJ sought the opinion of Dr. W. Benton Boone, an ophthalmologist, through written interrogatory. AR 658. Dr. Boone reviewed the evidence provided and summarized his findings as follows: Marfan syndrome with the ocular manifestation of bilateral subluxation of the crystalline lenses of both eyes and subsequent retinal detachment repair and lensectomy in both eyes; glaucoma following trabeculectomy; high myopia; and uveitis. AR 659, 660. Dr. Boone stated that all of those conditions led to visual impairments of marked decrease in the central vision of either eye at one time or another, but none of those impairments lasted for a year or more. AR 659. He remarked that Ms. Smith was fortunate to respond well to treatments and retain good vision in both eyes. *Id.*

Dr. Boone opined that Ms. Smith's visual impairments did not meet nor were they equal to Listings 2.02, 2.03, and 2.04. *Id.* He explained that he concentrated on exhibits containing information on Ms. Smith's central and peripheral vision. *Id.* With respect to Ms. Smith's central vision, he paid particular attention to seven medical records from 2013, 2015, and 2016, which noted that Ms. Smith's right eye varied from 20/20 to 20/70 and her left eye from 20/20 to 20/40. *Id.* Based on those records, he concluded that Ms. Smith did not meeting Listing 2.02. With respect to Ms. Smith's peripheral vision, Dr. Boone stated that he could not find any visual field examinations in the record, and therefore he could not evaluate whether Ms. Smith met Listings 2.03 or 2.04. He concluded:

> The claimant does not meet the listings, and although she had marked vision loss at one time or another in either eye—none lasted for a year—she was fortunate enough to ultimately end up with good central vision in both eyes. And because I could find no visual field examinations in the record, the peripheral vision could not be assessed, and in the end, I can ascribe no visual impairments to this claimant.

*Id.* Dr. Boone affirmed that sufficient objective medical and other evidence was provided to allow him to form opinions about the nature and severity of Ms. Smith's impairments during the relevant time period, and he did not indicate that any additional evidence was required. AR 660.

### B. Self-Reported and Other Source Evidence

#### 1. Ms. Smith's June 24, 2013 function report

On June 24, 2013, Ms. Smith completed a function report. AR 305–13. She stated that she lives in a house with her husband. AR 305. She described the following conditions as limiting her ability to work: "bad balance, hard to stand for more than 10 min at a time, can not walk more than 2 blocks[,] hurts to sit for more than 30 min[,] can't read regular sized print (no lense [sp] in right eye unable to see close up)." *Id.* Her daily routine consisted of getting out of bed, using the bathroom, laying down, showering, rubbing Icy-Hot on her back and hips, laying down, preparing and eating a bowl of cereal, putting dishes in the dishwasher, laying down, putting laundry in the washing machine, making a sandwich, laying down, vacuuming the living room, putting clothes in the dryer, sweeping the kitchen, laying down, preparing dinner, laying down, putting dishes in the dishwasher and starting it, laying down, folding and putting laundry away, and then going to bed. AR 306, 312. Ms. Smith was able to prepare meals daily, including sandwiches, boiled eggs, and frozen dinners, depending on her pain level. AR 307. She could prepare complete meals if she worked on them in 5-30 minute increments throughout the day. *Id.* Ms. Smith stated that she was able to do laundry, dishes, sweeping, vacuuming, and mopping, but that those tasks took most of her day because she had to stop and lay down periodically due to pain. *Id.* On "bad days," Ms. Smith's niece would help with her chores. *Id.* Ms. Smith was unable to do any yardwork, which her husband or nephew would do instead. AR 308. Ms. Smith stated that she took care of family members when she was able by doing the laundry, making dinner, and putting dishes in the dishwasher. She also cared for her dog by feeding her and letting her into the backyard. AR 306. Ms. Smith's husband would assist whenever she was unable to do something. *Id.*

Ms. Smith stated she went outside daily and that she was capable of driving alone. AR 308. Ms. Smith was able to shop for food, clothing, and shoes once a week for 20-30 minutes in stores or by computer. *Id.* She was capable of paying bills, counting change, and handling a savings account, but not capable of using a checkbook or money orders because she was unable to read the small print. *Id.* Ms. Smith was able to engage daily in her hobbies of watching television

and doing large print puzzle books.  AR 309.  She socialized with others on a daily basis by talking on the phone, but she was unable to go anywhere outside the home for social activities on a regular basis due to her pain.  *Id.*

Ms. Smith stated that her medical conditions affected her ability to lift anything over 10 pounds, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, and concentrate due to her pain.  AR 310.  She was able to walk about two blocks before needing to rest by laying down for about 10 minutes.  *Id.*  Her attention span and ability to finish what she started depended on her pain level.  *Id.*  She stated that she was able to follow written and spoken instructions well, that she got along well with others, that she could handle stress and changes in routine well, and that she had no unusual behaviors or fears.  AR 310–11.  Ms. Smith stated that prior to the onset of her medical conditions, she was able to read, see up close, walk farther, stand and sit longer, and walk her dog.  AR 306.  Her conditions also affected her ability to sleep, and that she usually was unable to sleep more than three or four hours due to her pain.  *Id.*  Ms. Smith stated that she had no problem with personal care, such as hygiene and grooming.  *Id.*

With respect to medical treatments and medications, Ms. Smith stated that she wore both glasses and contacts daily in order to see.  AR 311.  Her Lisinopril medication caused her to use the bathroom frequently and her Lumigan medication caused her to experience eye discoloration, long eyelashes, a dry cough, and blurry vision.  AR 312.

### 2. Cynthia Cox's June 24, 2019 third-party function report

Ms. Smith's sister, Cynthia Cox, submitted a function report in support of Ms. Smith's claims for SSI/DIB benefits on June 24, 2019.  AR 281–90.  She stated that she spent two hours a week with Ms. Smith.  AR 282.  She stated that due to her medical conditions, Ms. Smith was unable to walk long distances, to sit or stand for long periods, and to see close up.  *Id.*

Ms. Cox described Ms. Smith's daily routine as putting in her contacts and glasses, showering, laying down on the couch or bed "a lot" due to pain, microwaving meals, and doing a small amount of housework.  AR 283.  Ms. Smith was capable of doing laundry and preparing meals, and of feeding her dog and letting her outside.  *Id.*  Ms. Cox stated that Ms. Smith was able to prepare cereal, sandwiches, and frozen food for meals on a daily basis, which would take five to

fifteen minutes depending on the meal. AR 284. Ms. Smith was also able to do some cleaning and laundry "in sections" throughout the day. *Id.* When Ms. Smith was in a lot of pain, Ms. Cox's son or niece would assist Ms. Smith with house chores and preparing meals. *Id.* Ms. Cox stated that Ms. Smith was unable to do any yardwork due to her pain. AR 285.

Ms. Cox also stated that Ms. Smith left the home at least once a week and was able to drive and ride in a car alone "on good days." *Id.* Ms. Smith was able to shop for food and clothing in stores and by computer on a weekly basis for 20 minutes, depending on her pain level. *Id.* Ms. Smith was also able to pay bills, count change, and handle a savings account, but she could not use a checkbook or money orders because she was unable to see small print due to her eye surgery. *Id.* Ms. Cox stated that "[a]ll [Ms. Smith] really does is watch [television]" on a daily basis and that because of her inability to see small print, Ms. Smith could no longer read or play cards. AR 286. Since the onset of her medical conditions, Ms. Smith could no longer read, do puzzles, or take her nieces and nephews out. *Id.* Ms. Cox stated she would take Ms. Smith to the grocery store on a weekly basis, and that Ms. Smith socialized with others by talking on the phone to family members. *Id.* However, Ms. Smith did not go anywhere for socializing on a regular basis. *Id.* Although Ms. Smith did not have any trouble getting along with others, Ms. Cox noted that Ms. Smith mostly stayed at home since the onset of her conditions, and that she did not visit family as often due to increased pain. AR 287.

Ms. Cox stated that Ms. Smith's medical conditions affected Ms. Smith's ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, and concentrate due to increased pain. *Id.* Ms. Cox noted that it took Ms. Smith longer to complete tasks, and that Ms. Smith walked less and used scooters in stores. *Id.* Ms. Smith was also unable to see close up. *Id.* Ms. Cox estimated that Ms. Smith could walk about one and a half blocks before needing to rest for 10-15 minutes. *Id.* Ms. Cox stated that the greater Ms. Smith's pain, the more easily her concentration was broken, and depending on her pain, Ms. Smith could concentrate for about an hour. *Id.* Ms. Smith was unable to finish what she started. *Id.* Ms. Cox stated that Ms. Smith was able to follow written and spoken directions, that she got along well with authority figures, and that she handled stress and changes in routine well. AR 287–88. Ms. Cox noted that Ms.

Smith displayed "anger that 'people' (government offices and doctor offices) don't provide large print forms [and] that she is treated like the only person with visual impairment." AR 288. Ms. Cox stated that Ms. Smith wore both contacts and glasses simultaneously on a daily basis and was unable to see without them. *Id.*

Ms. Cox stated that prior to the onset of her medical conditions, Ms. Smith was able to do all housework, laundry, read, and see up close. AR 283. She stated that pain made it difficult for Ms. Smith to sleep. *Id.* Ms. Smith had no problem with personal care, such as hygiene and grooming. *Id.* Ms. Cox also stated:

> My sister is getting more unable to do things due to pain. She is angry and depressed at times due to her inability to read small print and <u>nobody</u> will attempt to generate larger print forms. It makes her feel like the only person with a visual impairment. She no longer goes anywhere besides the grocery store and the doctor.

AR 289 (emphasis original).

### C.   Administrative Proceedings

Ms. Smith's applications for SSI and DIB were denied initially and upon reconsideration. She requested a hearing before an ALJ. At the hearing on April 19, 2016, the ALJ received testimony from Ms. Smith and a vocational expert.

#### 1.   Ms. Smith's testimony

Ms. Smith testified about her living situation and daily activities, her symptoms, and her work history. AR 41–64. She was represented by a non-attorney representative. AR 41.

Ms. Smith testified at length about her various physical conditions. With respect to her vision, Ms. Smith testified that she had undergone surgeries in both eyes for retinal tears and detachments and to remove the lenses from both eyes. AR 53, 55. Following those surgeries, Ms. Smith could see well enough to drive, but was unable to read small print without experiencing headaches. AR 54. She was also diagnosed with glaucoma, and an increase in eye pressure would cause headaches. AR 54–55. Ms. Smith reported that her eye pressure had been under control since October 2015. AR 55.

Ms. Smith testified that she had scoliosis, for which she underwent four surgeries, two as a child, and two in 1998. AR 57, 60. Ms. Smith also testified that she suffered from pain in her

19

back, left knee, and hip.  AR 56–57, 59.  She tore her meniscus in her left knee twice, requiring surgery both times.  AR 56–57.  As a result, Ms. Smith had difficulty sitting for more than half an hour, after which she would get up, walk around, lay down, or put Icy Hot on her back.  AR 57–58.  After 30-45 minutes, she would be able to sit for another short period again.  AR 58.  She testified that she was unable to squat, kneel or crawl, and that she occasionally needed a cane to walk.  *Id.*  Ms. Smith stated that she could walk about a block to a block and a half at most before she needed to lie down and take over-the-counter pain medication, which she preferred over prescription pain medication that made her sleepy.  AR 60.  She also testified that she could stand for about 20 minutes.  AR 61.  She said she required about 30-45 minutes to recover from these short periods of activity.  *Id.*  Ms. Smith testified that she could comfortably lift five pounds, and that she was capable of lifting up to ten pounds but that amount of weight placed pressure on her lower back.  AR 62.  She stated that the more activity she engaged in, the more pain she experienced.  AR 61.

With respect to her mental impairments, Ms. Smith testified that other than two counseling sessions after suffering a physical assault, she did not have any ongoing mental health counseling.  AR 63.

Ms. Smith gave limited testimony about her activities of daily living.  She said that she was able to stand to take a shower.  AR 62.  She was able to drive only during the day.  AR 48.  When grocery shopping, she used the store's scooter to move around, although recently her mother had been doing shopping for her.  AR 59.

Prior to the alleged onset date, Ms. Smith stated that she worked out of her home looking after children.  AR 49–50.  After the alleged onset date, she stated that she attempted to find part-time work in childcare from May 2013 to July 2013 without success.  AR 52.  She testified that she would have accepted full-time work had it been offered.  *Id.*

During the hearing, the ALJ emphasized multiple times to both Ms. Smith and her non-attorney representative the need for Ms. Smith to provide complete ophthalmological medical records, and Ms. Smith confirmed that her medical records were complete.  AR 43–46, 55–56, 72.  The ALJ left the record open for at least two weeks following the hearing for Ms. Smith to provide

20

any supplemental records.  AR 47.  After the hearing, the ALJ also sought a further opinion from Dr. Boone based on the administrative record that Ms. Smith had provided.  AR 658.

### 2.  Vocational expert testimony

Vocational expert Jacklyn Benson-Dehaan testified at the hearing.  AR 64–71.  She opined that a hypothetical individual of Ms. Smith's age and education with no relevant past work and with Ms. Smith's limitations to sedentary work, lifting and carrying 10 pounds maximum occasionally and frequently, occasionally climbing ramps or stairs, frequently balancing, and occasionally stooping, kneeling, crouching, or crawling could perform three jobs: assembler (DOT: 734.687-018), document preparer (DOT: 249.587-018), and type-copy examiner (DOT: 979.687-026).  AR 65–66.  Ms. Benson-Dehaan further opined that such an individual with the additional limitation of needing large print text would be able to perform the assembler job only.  AR 67.  She stated that the Dictionary of Occupational Titles and the Selected Characteristics of Occupations did not address large print, and that she based her opinion on her professional experience completing labor market research and job analysis regarding light occupations.  AR 68.  Ms. Benson-Dehaan did not describe that research and analysis and was not asked about it.

In response to questioning from Ms. Smith's representative, Ms. Benson-Dehaan testified that a hypothetical individual of Ms. Smith's age and education with no relevant past work and with Ms. Smith's limitations of sedentary work, lifting and carrying 10 pounds maximum occasionally and frequently, occasionally climbing ramps or stairs, occasionally balancing, never stooping, kneeling, crouching, or crawling, and only sitting for half an hour at a time before needing a half hour break to rest would not be able to perform any jobs.  AR 69.

### 3.  The ALJ's decision

At step one of the sequential analysis, the ALJ found that Ms. Smith had not engaged in substantial gainful activity since the alleged onset date of January 1, 2013.  AR 20.

At step two, the ALJ found that Ms. Smith's scoliosis, Marfan syndrome, depression, and anxiety qualified as severe impairments.  *Id.*  The ALJ found that Ms. Smith's visual disorders, migraine headaches, degenerative changes of the knees, neck and right hip, heart disorders, high blood pressure, and vertigo, when considered individually or together with any other

21

1  impairment(s), caused only transient and mild symptoms and limitations, were well controlled

2  with treatment, did not meet the durational requirement, or were otherwise not adequately

3  supported by medical evidence in the record, and therefore were not severe.  AR 21–24.

4       In particular, with respect to Ms. Smith's ophthalmological disorders, the ALJ

5  acknowledged a history of Marfan syndrome.  AR 21.  The ALJ recounted Ms. Smith's medical

6  history of retinal detachments and subsequent surgeries and lensectomies, as well as her

7  trabeculectomy for her glaucoma.  *Id.*  The ALJ relied on and gave great weight to Dr. Boone's

8  opinion in finding that Ms. Smith's visual impairments were not severe and did not meet the

9  durational requirement.  AR 21–22.

10      At step three, the ALJ determined that Ms. Smith did not have an impairment or

11 combination of impairments that met or medically equaled the severity of one of the listed

12 impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525,

13 404.1526, 416.920(d), 416.925, and 416.926).  AR 24.

14      At step four, the ALJ determined that Ms. Smith has the RFC to perform sedentary work as

15 defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could lift and/or carry a

16 maximum of 10 pounds on a frequent and occasional basis, she could occasionally climb ramps

17 and stairs, stoop, kneel, crouch, and crawl, and could frequently balance.  AR 26.  The ALJ also

18 determined that Ms. Smith was precluded from climbing ropes, ladders, and scaffolds walking on

19 slick or uneven walking surfaces, operating foot pedals, and driving commercially.  *Id.*  The ALJ

20 further determined that she should avoid work at unprotected heights and around moving

21 mechanical parts, and that she was able to interact on an occasional basis with the public.  *Id.*  The

22 RFC did not include a restriction regarding Ms. Smith's visual impairments.

23      In her step four analysis, the ALJ gave partial weight to Dr. Tanenhaus's opinion.  AR 29.

24 The ALJ relied on Dr. Tanenhaus's opinion that Ms. Smith's depression did not limit her daily

25 activities because that opinion was premised on his psychiatric evaluation.  *Id.*  However, the ALJ

26 rejected Dr. Tanenhaus's opinion that Ms. Smith's ability to maintain adequate pace was severely

27 impaired due to her physical condition, that she needed additional breaks, and that she would have

28 difficulty completing a normal workday or work week.  *Id.*  The ALJ rejected that portion of his

opinion because the other consultative examinations and the longitudinal record did not support those functional limitations. *Id.* Instead, the ALJ relied on Dr. Lewis's opinions because Dr. Lewis performed a physical examination of Ms. Smith. *Id.*

Additionally, in her step four analysis, the ALJ found that Ms. Smith's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, but she found Ms. Smith's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible or consistent with the medical evidence and other evidence in the record. *Id.*; AR 30, 31. Specifically, the ALJ cited the absence of any comprehensive examinations with aggressive medication for either Ms. Smith's heart condition or scoliosis. AR 30. In addition, the ALJ found that although Ms. Smith had undergone multiple eye surgeries, she retained good visual acuity and was able to drive during the day. AR 30–31. Relying on the testimony of the vocational expert, the ALJ found that Ms. Smith's inability to read small print was not a significant limitation for all work activity. AR 31. The ALJ also noted that although Ms. Smith complained of mental health symptoms, the record did not show that she sought follow-up care or treatment for any mental health condition, and that Ms. Smith continued to pursue activities without significant compromise due to her mental health. *Id.* With respect to Ms. Smith's Marfan syndrome, the ALJ noted that the scoliosis did not require ongoing medical attention that would otherwise be associated with significant and persistent symptoms, and found that the record contained no recommendation for pain management or physical therapy for her back pain that would be expected when considering the alleged severity. *Id.* The ALJ also noted that Ms. Smith performed a variety of daily activities, and although she alleged a progression of her symptoms that required assistance from family members, she was still capable of sharing chores, driving, shopping, watching television, and caring for her own hygiene and grooming. *Id.* Furthermore, the ALJ noted that Ms. Smith looked for work after the alleged onset date and would have accepted a full-time job had it been offered, which was inconsistent with her allegations of severe pain and functional loss for work. *Id.* Finally, the ALJ found Ms. Cox's statement partially consistent with the record evidence, but discounted it because it was inconsistent with the medical evidence and the lack of longitudinal complaints about functional limitations. *Id.*

The ALJ concluded that Ms. Smith was not disabled and that she was capable of performing work as an assembler, document preparer, and type-copy examiner. AR 32–33.

The Appeals Council denied Ms. Smith's request for review, and the ALJ's decision became the Commissioner's final decision.

## III.     STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523; *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

## IV.     DISCUSSION

Ms. Smith contends that the ALJ erred in multiple respects: (1) the ALJ failed to develop the record concerning her visual impairments; (2) the ALJ erred at step two in not finding her visual impairments to be severe; (3) the ALJ erred at step four by failing to account for Ms. Smith's visual impairments in the RFC; (4) the ALJ erred at step four in discounting or rejecting Dr. Tanenhaus's opinion; (5) the ALJ erred in finding the statements of Ms. Smith and Ms. Cox not entirely credible or consistent with the record; and (6) the ALJ failed to meet her burden at step five in evaluating the testimony of the vocational expert.

### A.     The ALJ's Development of the Record

Ms. Smith argues that Dr. Boone's post-hearing interrogatory responses stated that further tests were needed to evaluate whether Ms. Smith's visual impairments met or medically equaled the criteria for Listings 2.03 A, B, C (contraction of the visual field in the better eye) and 2.04 A or B (loss of visual efficiency or visual impairment in the better eye), and that therefore the ALJ was obligated to develop the record further by either asking Ms. Smith's treating physicians for additional records or ordering further testing. Dkt. No. 26 at 8–10. The Commissioner responds that Ms. Smith bears the burden of proving that she is disabled by providing complete medical records to the ALJ, and that Ms. Smith affirmed at the hearing that the ALJ was in possession of all her ophthalmological records. Dkt. No. 31 at 1–3.

"The ALJ is responsible for studying the record and resolving any conflicts or ambiguities in it." *Diedrich v. Berryhill*, 874 F.3d 634, 638 (9th Cir. 2017). An ALJ is obligated to fully and fairly develop the record even if the claimant is represented by counsel. *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003). There is a heightened duty where the claimant is suffering from a mental condition, because claimants with mental impairments may not be able to protect themselves from loss of benefits by producing evidence. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). An ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). This duty may require the ALJ to obtain additional information by, for example, contacting treating physicians, scheduling consultative examinations, or calling a medical expert. 20 C.F.R. §§ 416.912(b), 416.913a, 404.1512, 404.1513a; *see also Tonapetyan*, 242 F.3d at 1150.

Ms. Smith contends the administrative record was defective in two respects: First, she says that the ALJ failed to develop the record with respect to her visual field (peripheral vision) impairments. Second, Ms. Smith argues that material ophthalmological records are missing from the administrative record. Dkt. No. 26 at 10–12.

#### 1.     Ms. Smith's peripheral vision

With respect to Ms. Smith's peripheral vision, the record reflects that Ms. Smith never

identified any peripheral vision issues as impairing her ability to work in support of her claims for SSI and DIB until this appeal. Indeed, her chief vision-related complaint has been an inability to read small or ordinary-size print—a function of her visual acuity or her central vision, not her peripheral vision. AR 54–55, 305, 306, 308, 309; 20 C.F.R. Part 404, Subpart P, Appendix 1, 2.00A1, 2.00A4 ("A loss of visual acuity limits your ability to distinguish detail, read, or do fine work. . . . To evaluate your visual disorder, we usually need a report of an eye examination that includes measurements of your best-correct central visual acuity . . . or the extent of your visual fields . . . , as appropriate."). In her self-report, Ms. Smith mentioned her inability to read small print or to see up close six times, but she never once mentioned any problems with her peripheral vision. AR 305–13. Ms. Smith also retained her ability to drive, suggesting no problem with her peripheral vision. AR 48. Although she was only able to drive during the day, she reported that she did not drive at night due to glare from headlights, and not because of problems with her peripheral vision. AR 49.

Furthermore, there was no medical record evidence to suggest that Ms. Smith experienced any serious problems with her peripheral vision. The sole mention of any visual field issues in the reports of Ms. Smith's treating physicians is Dr. Kayser's January 3, 2013 note that "confrontation visual fields demonstrated inferior and temporal visual field defect" in Ms. Smith's right eye, but that "[h]er visual field was full" in the left eye. AR 377. Ms. Smith's ophthalmological records for the next three years did not include any discussion of any visual field problems. Because Ms. Smith did not present any evidence of limitations resulting from a peripheral vision impairment, the ALJ did not err in relying on Dr. Boone's opinion finding that Ms. Smith did not meet Listings 2.03 or 2.04. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."); *see also Crane v. Barnhart*, 224 F. App'x 574, 578–79 (9th Cir. 2007) (holding that signed written opinion of state agency physician who concluded that claimant's impairments did not meet or equal the listings was a sufficient basis for the ALJ's equivalence determination).

Ms. Smith contends that Dr. Boone "opined that additional tests—specifically, visual field

26

examination reports—were needed to evaluate whether Ms. Smith's visual impairments met" the Listings. Dkt. No. 26 at 8. That is not an accurate characterization of Dr. Boone's statement. Rather, Dr. Boone stated that he could not evaluate or determine whether Ms. Smith met Listings 2.03 A, B, C and 2.04 A or B because the administrative record did not include any visual field examinations: "[B]ecause I could find no visual field examinations in the record, the peripheral vision could not be assessed, and in the end, I can ascribe no visual impairments to this claimant." AR 659. Dr. Boone also stated that the record contained sufficient objective medical and other evidence to allow him to form an opinion about the nature and severity of Ms. Smith's impairments during the relevant period. AR 660.

## 2. Missing documents

With respect to the documents allegedly omitted from the administrative record, those missing records include the surgeon's report of Ms. Smith's August 4, 2015 left eye lensectomy and treatment notes from several visits. Specifically, Ms. Smith states the following pages of treatment notes are missing[6]:

- Page 2 of 2 of the treatment notes documenting the January 16, 2013 visit with Dr. Cochrane. AR 447.
- Page 2 of 2 of the treatment notes documenting the February 4, 2013 visit with Dr. Mastroni. AR 445.
- Page 2 of 2 of the treatment notes documenting the February 25, 2013 visit with Dr. Mastroni. AR 444.
- Page 2 of 2 of the treatment notes documenting the August 3, 2015 visit with Dr. Cochrane. AR 547.
- Page 1 of 2 of the treatment notes documenting the October 12, 2015 visit with Dr. Cochrane. AR 538.

Ms. Smith believes that at least the missing page of the October 12, 2015 visit with Dr. Cochrane is material to whether she met Listings 2.03 or 2.04, which require objective medical evidence concerning a claimant's visual field, or peripheral vision. Dkt. No. 26 at 11; 20 C.F.R. Part 404,

---

[6] The missing second pages of the January 16, February 4, February 25, 2013 and August 2, 2016 visits would have included the signatures of the doctors who met with Ms. Smith on those dates. The Court infers that the January 16, 2013 and August 3, 2016 visits were with Dr. Cochrane and the February 4, 2013 and February 25, 2013 visits were with Dr. Mastroni based on the doctor identified as taking Ms. Smith's history of present illness on those dates. AR 444, 445, 447, 547.

Subpart P, Appendix 1, 2.00.A1, A6–7.  However, as discussed above, Ms. Smith did not assert disability based on any limitations resulting from any peripheral vision impairment, and therefore the ALJ was not required to further develop the record and obtain those documents as they pertained to her peripheral vision.  *See supra* Section IV.A.1.

Alternatively, Ms. Smith argues that the missing documents create ambiguity in the administrative record as to whether her visual impairments met the durational requirement.  *Id.* at 11–12.  That argument is collateral to Ms. Smith's contention that the ALJ improperly categorized Ms. Smith's visual impairments as non-severe at step two, which the Court addresses below.  *See infra* Section IV.B.  With respect to the first three missing pages from the January 16, February 4, and February 25, 2013 visits, those visits occurred within two months of the retinal detachment surgery and lensectomy in Ms. Smith's right eye occurring on January 3, 2013, and therefore would not have informed an assessment regarding whether her visual impairments resulting from those conditions lasted or could be expected to last for 12 months.  Likewise, the retinal detachment surgery and lensectomy in Ms. Smith's left eye took place on August 4, 2015, and therefore the treatment notes from August 3 and October 12, 2015 could not have demonstrated that her visual impairments resulting from those conditions lasted or could be expected to last for 12 months.  Even if the treatment notes were omitted from the record in error, such error was harmless because the administrative record includes other treatment notes that post-date the missing notes and reflect the status of Ms. Smith's visual impairments over the period of time at issue.

Ultimately, Ms. Smith bears the burden of proving disability by providing her complete medical records.  *Burch*, 400 F.3d at 683; *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). During the hearing, the ALJ emphasized multiple times the need for Ms. Smith to provide complete ophthalmological medical records, and Ms. Smith confirmed that her medical records were complete.  AR 43–46, 55–56, 72.  The ALJ also left the record open for at least two weeks following the hearing for Ms. Smith to provide any supplemental records.  AR 47.  Given this history, Ms. Smith's argument faulting the ALJ for not obtaining these missing pages is not well-taken.

28

The Court denies Ms. Smith's motion for summary judgment and grants the

Commissioner's cross-motion for summary judgment on this issue.

**B.** **The ALJ's Step Two Analysis of Ms. Smith's Visual Impairments**

Ms. Smith asserts that the ALJ erred in finding that the myopia in her left eye and retinal

detachments in both eyes were non-severe at step two of the analysis. Dkt. No. 26 at 11–12. First,

Ms. Smith argues that her myopia lasted at least a year. *Id.* at 11. In support of that assertion, Ms.

Smith cites only to medical records dated in January and February 2013. *Id.* (citing AR 378, 382,

444). Those early records include a January 2, 2013 letter from Dr. Lanning to Dr. Kayser, in

which he notes that Ms. Smith's prescription for her left eye was -10.50 -4.50 x 153, which would

give her corrected visual acuity of 20/40. AR 382. Dr. Lanning also notes that Ms. Smith's best

corrected acuity has historically been 20/40. *Id.* The early records also include a January 3, 2013

letter from Dr. Kayser to Dr. Lanning, in which she noted that Ms. Smith had "high myopia" in

both eyes. AR 378. In that same letter, Dr. Kayser noted that Ms. Smith's corrected left eye

visual acuity was 20/50, increasing to 20/40 with pinholing. AR 377. Ms. Smith does not point to

any more recent records indicating continuing myopia that could not be corrected.[7] Ms. Smith's

medical exams with Dr. Lewis on June 20, 2013 and July 10, 2014 showed her left eye visual

acuity to be 20/50 without lenses, and later 20/70, including with pinholing. AR 427, 497. A

review of Ms. Smith's most recent ophthalmologic records shows that on May 17, 2016, Dr.

Mastroni noted that her left eye visual acuity was 20/30. AR 648.

Regardless, Dr. Boone noted Ms. Smith's high myopia in his interrogatory response, upon

which the ALJ relied and as to which the ALJ gave great weight. AR 21–22, 659. Dr. Boone paid

particular attention to Dr. Lanning's January 2, 2013 letter in which Dr. Lanning noted that Ms.

Smith's best corrected visual acuity in her left eye was 20/40—the same letter Ms. Smith relies on

---

[7] Ms. Smith argues elsewhere in her motion that her extreme left eye myopia was documented as present on February 25, 2013, and not documented as "corrected" until September 21, 2015. Dkt. No. 26 at 12 n.12. This argument ignores Dr. Lanning and Dr. Kayser's correspondence stating that Ms. Smith had high myopia but that her corrected visual acuity was 20/40. AR 377, 382. The change from "extreme nearsightedness in the left eye to extreme farsightedness" is the result of the removal of the lens in her left eye in August 2015. *See, e.g.*, AR 648–49 (describing retinal detachment and lensectomy in left eye).

to argue that her myopia was severe and of sufficient duration to qualify for disability. AR 659. Despite Ms. Smith's history of myopia, Dr. Boone nonetheless determined that she did not meet Listings 2.02, 2.03, or 2.04 and that she still maintained "good central vision in both eyes." *Id.* Accordingly, the Court does not find that the ALJ erred in finding Ms. Smith's left eye myopia to be non-severe.

Alternatively, Ms. Smith contends that even if neither retinal detachment resulted in over 12 months of uncorrectable visual impairment, "such impairments were still required to be considered in connection with their impact of near acuity (vision within 20 inches), because Ms. Smith's retinal detachments and [g]laucoma were related to her Marfan[] syndrome making any suggestion that they failed to meet durational requirements . . . ill founded." Dkt. No. 26 at 12. The Court understands Ms. Smith to suggest that because the retinal detachments and glaucoma were the result of her Marfan syndrome, which the ALJ found to be severe and to have met the durational requirement, the ALJ should have extended her finding concerning the Marfan syndrome to Ms. Smith's visual impairments. AR 20. But simply because Ms. Smith had medical conditions associated with Marfan syndrome does not mean that each such condition is automatically severe and of at least twelve months' duration.

To the extent Ms. Smith contends the ALJ erred in not connecting her visual impairments to her Marfan syndrome, Ms. Smith is incorrect. The ALJ expressly accounted for the connection between Ms. Smith's visual impairments and her Marfan syndrome. AR 21 ("With respect to the claimant's allegations pertaining to her ophthalmological disorders, there is a history of Marfan syndrome."). The ALJ provided a detailed analysis of the history of Ms. Smith's retinal detachments and glaucoma with high intraocular pressure, which were each separately treated and deemed under control or stable within a year of diagnosis. AR 21–22. Even assuming that the retinal detachments and glaucoma met the durational requirement, the record reflects that those conditions had been addressed through effective medical treatment and the ALJ did not err in concluding they were not severe. *See* AR 632, 659; *Warre v. Comm'r of the Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

Accordingly, the Court finds that the ALJ did not err at step two, and that substantial evidence supported the ALJ's determination that Ms. Smith's retinal detachment and glaucoma were not severe impairments. The Court denies Ms. Smith's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment on this issue.

### C. The ALJ's Step Four Analysis

In finding that Ms. Smith is not disabled based on her spinal curvature, Marfan syndrome, depression, and anxiety, the ALJ gave partial weight to Dr. Tanenhaus's opinion as to Ms. Smith's psychological condition, but rejected Dr. Tanenhaus's opinion as to her physical condition. AR 29. Ms. Smith contends that the ALJ improperly rejected Dr. Tanenhaus's opinion concerning Ms. Smith's Marfan syndrome and its collective associated impairments, her chronic back pain, kyphosis, and impaired gait, her mitral valve prolapse and dilated aortic root, and her visual impairments. Dkt. No. 26 at 14–19. The Commissioner argues that the ALJ assigned the appropriate weight to Dr. Tanenhaus's opinion. Dkt. No. 31 at 4–6.

The ALJ rejected the portion of Dr. Tanenhaus's opinion stating that Ms. Smith's ability to maintain adequate pace throughout the workday was severely impaired due to her physical condition, that she needed additional breaks, and that she would have difficult completing a normal workday or workweek reliably. AR 29. In doing so, the ALJ explained that she rejected that portion of his opinion "because the other consultative examinations and the longitudinal record does not support such limitations." *Id.* Moreover, the ALJ chose to rely on Dr. Lewis's opinions concerning Ms. Smith's physical impairments instead of Dr. Tanenhaus's opinion because Dr. Lewis conducted two physical examinations and her opinion was supported with clinical findings. *Id.* In contrast, it appears that Dr. Tanenhaus did not perform a physical examination—indeed, he was consulted for a psychological evaluation, not a physical one—and he cited no evidence concerning Ms. Smith's physical condition other than what she told him. "'[T]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.'" *Bray v. Comm'r of Social Security Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)). Accordingly, the Court finds that the ALJ provided clear and

convincing reasons to reject the portion of Dr. Tanenhaus's opinion concerning Ms. Smith's ability to maintain adequate pace throughout the workday, based on substantial evidence.

Accordingly, the Court finds that the ALJ did not err at step four in rejecting Dr. Tanenhaus's opinion. The Court denies Ms. Smith's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment on this issue.

### D.    The ALJ's Credibility Findings

In finding that Ms. Smith is not disabled, the ALJ did "not find that the claimant's allegations regarding the severe symptoms and limitations consistent with the evidence as a whole," based primarily the lack of evidence of treatment in Ms. Smith's medical records, her activities of daily living, and her efforts and willingness to secure employment. AR 31–32. Ms. Smith argues that the ALJ erred in determining that her testimony was less than fully credible. Dkt. No. 26 at 19–21. Ms. Smith also contends that the ALJ erred in discounting the statement of her sister, Ms. Cox. *Id.* at 21–22. The Commissioner maintains that the ALJ properly assessed Ms. Smith's credibility and her sister's statement. Dkt. No. 31 at 7–9.

#### 1.    Ms. Smith's credibility

In evaluating the credibility of a claimant's testimony regarding subjective symptoms, an ALJ must engage in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (internal citations and quotation marks omitted). The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (internal quotation omitted). "[O]nce the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity . . . ." *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (internal citation omitted). At the second step, unless there is affirmative evidence showing that the claimant is malingering, "the ALJ can reject the claimant's testimony about the severity of

[his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

Because the ALJ did not find that Ms. Smith was malingering, she was required to provide clear and convincing reasons to justify her rejection of Ms. Smith's testimony about her symptoms. The Court concludes that the ALJ has not met this standard.

### a.    Objective medical evidence of underlying impairment

The ALJ concluded that Ms. Smith's history of Marfan syndrome, spinal curvature, depression, and anxiety could reasonably be expected to cause the symptoms she alleges, including significant chronic pain, an inability to perform chores in for a sustained period of time, an occasional need for assistive devices in moving around, an inability to read small print, and cardiovascular complications. AR 30. Neither party challenges this conclusion.

### b.    The ALJ's analysis regarding the severity of symptoms

The ALJ determined that Ms. Smith's statements regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical evidence and other evidence in the record. In particular, the ALJ concluded that the lack of ongoing, aggressive treatment for Ms. Smith's heart condition, scoliosis, or pain complaints, the lack of treatment for any mental health symptoms, Ms. Smith's ability to perform a variety of activities of daily living, and her search for work after alleged onset of her disability did not support the alleged severity of symptoms.

### i.    Objective medical evidence

An ALJ may not rely solely on objective medical evidence (or the lack thereof) in rejecting Ms. Smith's statements about her symptoms. 20 C.F.R. §§ 416.929(c)(2), 404.1529(c)(2) (2016) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements."). Here, the ALJ did not discuss any objective medical evidence in discounting Ms. Smith's credibility, and Ms. Smith

does not rely on any objective medical evidence in challenging the ALJ's credibility findings.

### ii.     Medical record evidence

"Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis. . . .  The ALJ is permitted to consider lack of treatment in his credibility determination." *Burch*, 400 F.3d at 681. Here, the ALJ specifically noted that, in spite of the severe pain Ms. Smith alleged, the medical record does not indicate that any of her medical providers undertook comprehensive examinations or recommended aggressive medication treatment for her heart condition or scoliosis.  AR 30.  At the hearing, Ms. Smith testified that the only medications she was taking at that time were medicated eye drops for her eye condition, Lisinopril for high blood pressure, and Norco pain medication for the surgery she had on her left knee one month before the hearing.  AR 53.  Ms. Smith stated that she preferred over-the-counter pain medication such as Tylenol or Icy Hot for controlling her pain over prescription medication, which makes her drowsy.  *See, e.g.*, AR 58 (testifying that after 30 minutes of sitting, "I get up, I walk around, lay down, or put Icy Hot on my back"); AR 60 ("I would take Tylenol because the Norco makes it so I can't really do much.  It kind of knocks me out."); AR 360 (describing daily use of Icy Hot on her back and hips); AR 460 ("[Patient] has used Vicodin but found it was too strong and made her sleepy . . . .").

Ms. Smith argues that the Commissioner should have obtained medical records from before 2011, including records of her back surgeries in the 1980s and 1990s, on the ground that such records would have contradicted the ALJ's conclusion that Ms. Smith did not pursue any pain management or physical therapy.  Dkt. No. 26 at 20.  It is not clear how records dating back decades prior to the alleged onset of disability would have reliably informed the ALJ's assessment on this point.  In any event, Ms. Smith bore the burden of providing complete medical records and proving disability, and she had an extended opportunity to supplement the record if she chose. *Meanel*, 172 F.3d at 1113; AR 47.

The ALJ also considered the medical source statements in the record and found that they "reflect a functional capacity that does not support the level of symptoms and limitations described by the claimant."  AR 31.  Following her June 20, 2013 exam of Ms. Smith, Dr. Lewis concluded

that due to her decreased balance, joint pains, and back pain, Ms. Smith was limited to lifting and carrying 10 pounds and that she could climb, balance, stoop, kneel, crouch, and crawl occasionally. AR 428. Those particular findings did not change after Dr. Lewis's July 10, 2014 exam of Ms. Smith. AR 499. Therefore, the ALJ did not err in concluding that the medical evidence was inconsistent with the severity of Ms. Smith's reported symptoms.

### iii.      Activities of daily living

An ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms. *Molina v. Astrue*, 764 F.3d 1104, 1112–13 (9th Cir. 2012) (internal quotation marks and citations omitted). A claimant's daily activities may support an adverse credibility finding if the claimant is able to spend a substantial part of her day engaged in pursuits involving the performance of physical functions or skills that are transferable to a work setting. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). The Ninth Circuit has recognized that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations" and thus held that "[o]nly if [the claimant's] level of activity were inconsistent with [his] claimed limitations would these activities have any bearing on [the claimant's] credibility." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014) (quoting *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998)) (internal quotation marks omitted).

Here, the ALJ appeared to find Ms. Smith's activities of daily living inconsistent with the severity of symptoms she alleged. The ALJ found that Ms. Smith remained capable of shopping, driving, watching television, and sharing chores with her husband. AR 31. The ALJ also noted that Ms. Smith's conditions did not prevent her from handling her own personal hygiene, grooming, and dressing. *Id.*

However, the ALJ did not explain how Ms. Smith's activities of daily living, as she described them in her hearing testimony and function report, are inconsistent with her asserted impairments. Ms. Smith testified that she could only stand while showering for 10-15 minutes and that she was only able to shower three to four days a week. AR 61–62. She also testified that she

35

was able to handle a few household chores, but only if she performed them in short spurts with rest in between. AR 306–07, 312. The information Ms. Smith provided to various medical providers also demonstrated a progressive worsening of her pain symptoms that resulted in her decreasing ability to do chores. *Compare* AR 306–07 (June 2013 self-report statement that she could do laundry, dishes, sweeping, vacuuming, and mopping over a course of short periods of activity) *with* AR 496 (July 2014 statement to Dr. Lewis that she relied on a relative to do most of the chores because vacuuming, mopping, and sweeping hurt her back and that although she could fold and wash laundry, she could not carry it) *and* AR 503 (July 2014 statement to Dr. Tanenhaus that her nieces helped with cleaning and vacuuming, she shared loading the dishwasher with her husband but relied on him to put the dishes away, and that she could load the washing machine once dirty clothes were brought to the laundry). Ms. Smith's function report noted that she shopped once a week for only 20-30 minutes, but by the time of the hearing nearly three years later, she relied on her mother to do grocery shopping for her. AR 59, 308; *see also* AR 503 (informing Dr. Tanenhaus that she had difficulty with shopping because of her limitations due to standing and walking). Merely because a claimant carries on certain daily activities "does not in any way detract from her credibility as to her overall disability." *Orn*, 495 F.3d at 639 (citation omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834. The ALJ's determination did not specify what evidence undermined Ms. Smith's testimony concerning the gradual increase in her pain over the years.

Furthermore, the ALJ did not explain how Ms. Smith's activities of daily living are transferable to a work setting and how they inform the ALJ's conclusion that Ms. Smith is not disabled. *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."); *Garrison*, 759 F.3d at 1016 ("'The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an

36

employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.'") (quoting *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012)). Thus, to the extent the ALJ relied on Ms. Smith's activities of daily living as a reason to discount her credibility as to the intensity, persistence, and limiting effects of his condition, that reliance was not supported by clear and convincing reasons.

### c. Ms. Smith's attempts to secure employment

In evaluating Ms. Smith's credibility, the ALJ found significant her testimony that even after her alleged onset date, she sought work and would have been willing to accept full-time work had she received an offer. AR 31, 51–52. Ms. Smith argues that the ALJ improperly relied on Ms. Smith's statement that she would have been willing to accept full-time work if it had been offered, particularly since Ms. Smith did not hold herself out as available to perform full-time work. Dkt. No. 26 at 21 (citing *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165–66 (9th Cir. 2008)).

"A failed work attempt may not alone provide a clear and convincing reason for rejecting pain testimony . . . ." *Gilder v. Berryhill*, 703 F. App'x 597, 598 (9th Cir. 2017) (citing *Lingenfelter*, 504 F.3d at 1038). The evaluation of a claimant's allegations about her functional abilities based on her employment status appears to be highly context-dependent. *See, e.g.*, *Williams v. Colvin*, 699 F. App'x 495 (9th Cir. 2015) (concluding that in assessing the claimant's testimony, the ALJ permissibly relied on the claimant's own report that he stopped working due to a layoff and not because of any medical problems); *Lingenfelter*, 504 F.3d at 1036–37 (concluding that claimant's attempt to work at a time of alleged disability was not a clear and convincing reason for discounting the severity of his symptoms, where the record indicated that the claimant "fac[ed] difficult economic circumstances, tried to work for nine weeks, and because of his impairments, failed"). Here, the ALJ appears to have overlooked Ms. Smith's testimony that she sought only *part*-time work. Although seeking full-time work is inconsistent with allegations of disability, seeking part-time work is not. *Carmickle*, 533 F.3d at 1162.

Ms. Smith argues on appeal that her testimony about her willingness to accept full-time work reflects the "recognition of the desperation of her [financial] circumstance," but that was not

the reason she provided to the ALJ at the hearing. Rather, Ms. Smith testified that she stopped looking for work because she received no job offers. AR 52 (testifying that she sought work beginning May 2013 "[u]ntil July of that year and I just pretty much gave up" because "nobody wants to hire me"). Nevertheless, Ms. Smith's limited attempt to seek part-time work lasted only a few months in the middle of 2013—well before the progressive worsening of her pain that began manifesting in 2014. *Compare* AR 426 (reporting to Dr. Lewis in June 2013 that on a scale of 0-10, her pain was usually about a 5) *with* AR 496 (reporting to Dr. Lewis in July 2014 that on a scale of 0-10, her pain was a 7 or an 8). Placed in its proper context and in view of the total medical evidence of record, Ms. Smith's attempt to seek part-time work for a few months shortly after the alleged onset of disability was not inconsistent with her allegations of severe pain during the relevant period. The ALJ thus erred in relying on Ms. Smith's brief attempt to seek part-time employment to discount her credibility about the severity of her symptoms.

### d. Summary

In evaluating Ms. Smith's credibility, the ALJ properly relied on medical source statements that she found were inconsistent with Ms. Smith's testimony regarding the severity of her symptoms. The ALJ did not properly rely on purported evidence of Ms. Smith's attempts to secure work or activities of daily living. 20 C.F.R. §§ 416.929(c)(2), 404.1529(c)(2) (2016); *Gilder*, 703 F. App'x at 598. Because the ALJ was not permitted to rely solely on a lack of medical evidence to discredit Ms. Smith's testimony, *Burch*, 400 F.3d at 681, the Court concludes that the ALJ did not provide clear and convincing reasons, supported by substantial evidence, for discounting Ms. Smith's testimony concerning the severity of her symptoms.

Accordingly, the Court grants Ms. Smith's motion for summary judgment and denies the Commissioner's cross-motion for summary judgment on this issue.

### 2. Ms. Cox's statement

The ALJ discounted Ms. Cox's statement, finding that although Ms. Cox corroborated Ms. Smith's allegations and Ms. Cox's observations were "partially consistent with the evidence of record," "the medical evidence and lack of longitudinal complaints about limitations of the type described contradict[ed Ms. Cox's] opinion." AR 31. The ALJ offered no further details.

"Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account." *Molina*, 674 F.3d at 1114; *see also Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) ("Such testimony is competent evidence and *cannot* be disregarded without comment.") (internal quotations and citation omitted) (emphasis original). "If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons 'that are germane to each witness.'" *Bruce*, 557 F.3d at 1115 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)). "Further, the reasons 'germane to each witness' must be specific." *Id*. (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006)).

Ms. Smith argues that the ALJ failed to provide germane reasons for discounting Ms. Cox's statement for two reasons. First, she cites *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017) for the proposition that "[a] lack of support from the 'overall medical evidence' is . . . not a proper basis for disregarding a lay witness'[s] observations." Dkt. No. 26 at 22. Second, Ms. Smith argues that the ALJ's second reason for discounting Ms. Cox's statement—a "lack of longitudinal complaints about limitations of the type described"—lacks the specificity required to be germane. *Id.*

With respect to Ms. Smith's first argument, *Diedrich* relies on prior Ninth Circuit decisions in *Smolen* and *Bruce*, which in turn relies on *Smolen*. The *Smolen* ruling is based on the language of SSR 88–13, which has long since been superseded by 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). The 2016 version of those regulations provide that lay witness subjective symptom testimony shall be considered when consistent with the objective medical evidence. 20 C.F.R. § 404.1529(c)(3) (2016) ("[A]ny symptom-related functional limitations and restrictions which you . . . or other persons report, *which can reasonably be accepted as consistent with the objective medical evidence and other evidence*, will be taken into account . . . in reaching a conclusion as to whether you are disabled.") (emphasis added); 20 C.F.R. § 416.929(c)(3) (2016) ("[A]ny symptom-related functional limitations and restrictions that your . . . nonmedical sources report, *which can reasonably be accepted as consistent with the objective medical evidence and other evidence*, will be taken into account . . . in reaching a conclusion as to whether you are disabled."). Because the regulations expressly provide that the ALJ shall consider layperson statements if they

are reasonably consistent with medical evidence, the Court follows the Ninth Circuit's decision in *Bayliss v. Barnhart*, in which the Ninth Circuit held that "[i]nconsistency with medical evidence" may be a germane reason for discrediting a lay witness's statement. 427 F.3d 1211, 1218 (9th Cir. 2005).

Accordingly, the Court finds that *in*consistency with the medical evidence is a germane reason for discounting Ms. Cox's statement. Other district courts within the Ninth Circuit have similarly so held. *See, e.g.*, *Spurlock v. Colvin*, No. EDCV 14-01521-JEM, 2015 WL 1735196, at *9 (C.D. Cal. Apr. 16, 2015) (listing cases). The ALJ's opinion painstakingly discussed Ms. Smith's medical issues and the treatments for them, as well as the lack of longitudinal complaints for some of her issues, such as her vision problems. AR 21–24. In the ALJ's analysis concerning Ms. Smith's credibility, she addressed the lack of aggressive medication for Ms. Smith's heart condition or scoliosis, Dr. Boone's opinion that Ms. Smith retained good visual acuity, lack of any mental health treatment, and no pain management or physical therapy for her Marfan syndrome and its associated conditions. AR 30–31. The Court therefore finds that the ALJ provided specific, germane reasons for discounting Ms. Cox's statement.

Because the Court finds that the ALJ's reliance on Ms. Cox's statement's inconsistency with the medical record was a clear and convincing and sufficiently germane reason for discounting that testimony, the Court need not reach Ms. Smith's second argument concerning the "lack of longitudinal complaints."

The Court denies Ms. Smith's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment concerning the ALJ's evaluation of Ms. Smith's credibility and Ms. Cox's statement.

### E. The ALJ's Step Five Analysis

Ms. Smith argues that the vocational expert's testimony conflicted with the Dictionary of Occupational Titles ("DOT") and that the ALJ erred in relying on the vocational expert's testimony in concluding that Ms. Smith was not disabled. Dkt. No. 26 at 12–13. She contends that even if the ALJ correctly determined her RFC, the ALJ failed to account for her lack of near visual acuity. *Id.* Specifically, Ms. Smith contends that the jobs that the vocational expert

testified Ms. Smith could do all require constant or frequent near acuity, yet the vocational expert testified that even with a large print limitation, Ms. Smith could still perform the assembler position. The Commissioner argues that the identified jobs were not inconsistent with the ALJ's RFC. Dkt. No. 31 at 3–4.

Before an ALJ can rely on the testimony of a vocational expert, the ALJ must first inquire as to whether there exists a conflict between the expert's testimony and the Dictionary of Occupational Titles. *See Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007). "Although evidence provided by a vocational expert generally should be consistent with the [DOT], neither the [DOT] nor the vocational expert evidence automatically trumps when there is a conflict." *Id.* If the ALJ determines a conflict exists, "the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the [DOT]." *Id.*; *see also Lamear v. Berryhill*, 865 F.3d 1201, 1205 (9th Cir. 2017) (where there is an apparent conflict between the vocational expert's testimony and the DOT, the ALJ is required to reconcile the inconsistency); *Gutierrez v. Colvin*, 844 F.3d 804, 807 (9th Cir. 2016) (same); *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1003 (9th Cir. 2015) (same); *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015) (same). "[T]he ALJ has an affirmative duty to ask the expert to explain the conflict and then determine whether the vocational expert's explanation for the conflict is reasonable before relying on the expert's testimony to reach a disability determination." *Rounds*, 807 F.3d at 1003 (internal quotation marks and citations omitted). "[T]he conflict must be 'obvious or apparent' to trigger the ALJ's obligation to inquire further." *Lamear*, 865 F.3d at 1205; *Gutierrez*, 844 F.3d at 807.

At the hearing, the ALJ queried the vocational expert regarding whether a hypothetical person with Ms. Smith's limitations, including the additional limitation of requiring large print, could perform any work. AR 67. The vocational expert testified that such a person could not perform the document preparer or type-copy examiner jobs, but he or she could still perform the assembler job. *Id.* The vocational expert also testified that the DOT and its companion text do not specifically address large print, but that her opinion was based on her professional experience. AR 68. Ultimately, the ALJ relied on the vocational expert's testimony that Ms. Smith could still

41

perform the requirements of an assembler, document preparer, and type-copy examiner, which the ALJ found to be consistent with the information contained in the DOT.  AR 32.

The ALJ did not include the limitation of requiring large print in Ms. Smith's RFC.  AR 26.  However, the ALJ determined that Ms. Smith's ophthalmological disorders were not severe, based on the great weight given to Dr. Boone's post-hearing opinion that Ms. Smith retained good central vision despite her various eye conditions, including high myopia.  AR 21–22, 659.  At that point, Dr. Boone's opinion obviated the need for the ALJ to reconcile any conflict between the vocational expert and the DOT.  The ALJ therefore articulated clear and convincing reasons based on substantial evidence for not including large print among Ms. Smith's limitations when determining her RFC.

While Ms. Smith is correct in that the DOT lists the document preparer and type-copy examiner positions as requiring frequent near acuity (from 1/3 to 2/3 of the time), whereas the assembler position requires constant near acuity (2/3 or more of the time), the DOT's description for the type-copy examiner and document preparer positions expressly require reading text, whereas the description for the assembler position does not.  *Compare 734.687-018 Assembler*, Dictionary of Occupational Titles, 1991 WL 679950 (4th ed. 1991) ("Inserts paper label in back of celluloid or metal advertising buttons and forces shaped stickpin under rim.") *with 979.687-026, Type-Copy Examiner*, Dictionary of Occupational Titles, 1991 WL 688696 (4th ed. 1991) ("Examines proofsheets for irregularities in type characters indicative of defects in phototypesetting type disks: Examines each character on proof sheet for breaks, irregular spacing, improper alignment, and eccentricity, using magnifying glass.") *and 249.587-018 Document Preparer, Microfilming*, Dictionary of Occupational Titles, 1991 WL 672349 (4th ed. 1991) ("Reproduces document pages as necessary to improve clarity or to reduce one or more pages into a single page of standard microfilming size, using photocopy machine. . . . Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material.").  The conflict between the vocational expert's testimony and the DOT, therefore, was not obvious or apparent, and therefore the ALJ's obligation to investigate further was not triggered.  *Lamear*, 865 F.3d at

1205; *Gutierrez*, 844 F.3d at 807.

Accordingly, the Court denies Ms. Smith's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment on this issue.

## V. DISPOSITION

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). That is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106.

The Court may order an immediate award of benefits only if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Leon*, 880 F.3d at 1045 (quoting *Garrison*, 759 F.3d at 1020). Next, the Court "determine[s] 'whether there are outstanding issues that must be resolved before a determination of disability can be made . . . and whether further administrative proceedings would be useful.'" *Id.* (quoting *Treichler*, 775 F.3d at 1101). "When these first two conditions are satisfied, [the Court] then credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id.* Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability. *Id.* As explained by the Ninth Circuit, "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Id.* at 1044.

In the present case, the first condition is met because the Court has found that the ALJ failed to provide legally sufficient reasons for discounting Ms. Smith's statements regarding her symptoms and functional limitations. However, there are outstanding issues that must be resolved before a final determination can be made. The ALJ must reassess Ms. Smith's statements and

provide legally adequate reasons for any portion of those statements that the ALJ discounts or rejects.

## VI.     CONCLUSION

Based on the foregoing, Ms. Smith's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order. The Clerk of the Court shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: September 30, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge